## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

DANIEL KULL, as natural guardians of minor ) 
Child, C.E.K., et al., )
)
    **Plaintiffs,** )
)
**v.** )  **Case No. 2:24-cv-002380**
)
)
**VALOR NETWORK, INC., et al.** )
)
    **Defendants.** )

## DEFENDANT VALOR NETWORK, INC.'S MOTION TO EXCLUDE EXPERT TESTIMONY OF LARAE COPLEY, M.D. AND SUPPORTING MEMORANDUM OF LAW

Pursuant to Federal Rules of Civil Procedure 26 and 37, and Federal Rules of Evidence 104, 403 and 702, defendant Valor Network, Inc. (hereinafter "Valor" or "defendant") respectfully moves this Court to exclude the expert report, opinions, and testimony of plaintiffs' proposed mental health expert LaRae Copley, RPh, M.D., PhD ("Dr. Copley") *in its entirety*. Dr. Copley is not a qualified expert on the subject of the psychiatric impact of an elbow injury in a pediatric patient with a currently unknown outcome. Her opinions and testimony are neither relevant nor reliable under Federal Rule of Evidence 702 and the standards set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and its progeny. Her opinions and testimony are likewise inadmissible because any probative value they may have (and they have none) is substantially outweighed by the danger of unfair prejudice, confusion of the issues, waste of time, undue delay, and needless presentation of cumulative evidence. *See* Fed. R. Evid. 403.

**WHEREFORE**, Defendant respectfully prays that the Court enter an order excluding Dr. Copley's report, expert opinions and testimony in their entirety, or to the extent the Court deems proper and for such further relief as the Court deems fair and reasonable under the circumstances.

### MEMORANDUM OF LAW

The plaintiffs' mental health expert is not qualified under the Rules to offer the opinions stated in her report and deposition. Dr. Copley opines that C.E.K. has an "adjustment disorder" diagnosis. (Ex. A, Copley Depo, p. 101, lines 17-13). She lacks the requisite qualifications to opine on the mental health impact of a child with an elbow injury. She does not offer causation testimony that any "adjustment disorder" is on account of the alleged events or injury from September 2021 at issue in this case. (Ex. A, p. 67, lines 5-18). She did not employ any recognized methodology in performing her assessment and reaching her conclusions in this case (Ex. A, p. 140, lines 17-24). She has not administered any tests or rely on any authoritative literature or studies on the mental effects of an elbow injury. She has no comparable personal experience in any clinical or academic setting. She has never written on these subjects, and has no background, education or experience to support her as a practitioner who may opine on the subject in this case.[1]

Aside from her lack of qualifications, Dr. Copley's opinions are inadmissible because they are entirely speculative for the future because C.E.K. is still being treated and has not maximum medical improvement, he is still recovering and getting better and what is thought to be his final surgery is not scheduled until later this year. There is no existing data to support her ultimate conclusions, which means her opinions are based on impermissible "leaps of faith." The data that does exist, including testing from C.E.K., directly contradicts her opinions and conclusions. The Court should, therefore, exercise its gatekeeping function under Rule 702 and exclude Dr. Copley's testimony, in its entirety.

---

[1] Dr. Copley's file did contain three (3) articles which she declares to have reviewed, but she does not believe the articles are authoritative in order to somehow provide a basis for her opinion in this case, but claims they support her opinions. She cited no other articles. (Ex. A, p. 26, line 23 – p. 27, line 22).

### A. Statement of Facts

1.    Plaintiffs' designated mental health expert, LaRae Copley, M.D., graduated from medical school at Ohio State University in 2006. (Ex. C, Copley Depo Ex. 2, p. 1).

2.    She served as a staff psychologist for students at Ohio State serving the college students, leaving that position in 2022. (Ex. C, p. 2).

3.    Since 2022, plaintiffs' expert has been doing consulting work for Copley Medical Consulting, LLC and Providers for Healthy Living, L.L.C. (Ex. C, p. 1).

4.    Dr. Copley spends a total of 3-4 hours one night a week doing clinical psychiatry at Providers for Healthy Living, L.L.C.  (Ex. A, p. 31, lines 10-24).

5.    Dr. Copley is now a forensic psychiatrist, **in training**, and in the time of her deposition anticipated that she would complete forensic training in June 2025, (Ex. A, p. 139, line 6).

6.    Dr. Copley lists services on the SEAK expert site as an adult, child, and adolescent psychiatrist. (Ex. A, p. 46, lines 2-6). She was retained to this case to determine if C.E.K. suffered emotional harm from the injury occurring on September 23, 2021. (Ex. A, p. 65, line 13 – p. 66, line 4).

7.    Dr. Copley has attended presentations by SEAK on how to be an expert (Ex. A, p. 46, line 18- 47, line 3). She is not offering causation opinions (Ex. A, p. 67, line 20 - p. 68, line 15). She did not, in completing her evaluation, receive any records, or take into consideration, that C.E.K. experienced previous, multiple, fractures to his right forearm in 2018, along with a prolonged recovery spanning many months. (Ex. A, p. 68, line 16 - p. 69, line 19 ) She relies on studies, random bar opinion, and conclusions in his case (Ex. A, p. 27, line 8-10), but can't say tests articles are authoritative.

8.    Plaintiffs' expert uses a "template" which she uses for expert witness work and fills in information on the specific case. (Ex. A, p. 15, lines 3-16).

9.    The only medical records plaintiffs' expert received related to C.E.K.'s treatment for his elbow injury are related to the September 23, 2021 injury (Ex. D, Copley Depo Ex. 6, p. 1, No. 4, 5, 6, and 7). She did not receive or review any mental health, counselling, social work, or other records related to C.E.K. in connection with her expert work on this matter. (Ex. D, p. 1).

10.    Dr. Copley did receive Manhattan Catholic School records for C.E.K. for the years 2021-2023, and St. Bernard Catholic School records for years 2023-2025. (Ex. D, p. 1-2, No. 11 and 12). There were no indication of any mental health issues related to the events, or injury, at issue in this case. (Ex. A, p. 25, lines 11-16).

11.    She has done mental health testing in connection with evaluations in the past none involving a child like C.E.K. who has been injured. (Ex. A, p. 141, line 3 – p. 143, line 6).

12.    Dr. Copley is aware that CEK is part of a military family, and that children of military parents suffer mental health consequences when their family environment is disrupted frequently.  (Ex. A, 74, line 8 – p 75, line 19)

13.    The purported mental health expert was also aware that CEK had longstanding behavioral issues associated with urinating and deficating on himself while playing video games prior to the events of September 2021.  (Ex. A, p. 80, line 13 – p. 81, line 6)

14.    She is not aware of, and did not employ, any methodology to be used in performing the evaluation she attempted to undertake in this case. (Ex. A, p. 142, line 7 – p. 143, line 10).

15.    On December 7, 2024, Dr. Copley interviewed and observed C.E.K. and obtained historical information from his mother in a Cincinnati public library. (Ex. A, p. 96, lines 7-9).

16.    The only other contact she had with anyone about the situation was telephone calls with C.E.K.'s father (Ex. D, p. 1). She is aware from her forensics psychiatry training of the potential for recording interviews either by audio or video (Ex. A, p. 143, lines 10-19).

17.    She has done recorded interviews in the past (Ex. A, p. 143, line 13 – p. 147, line 3).

18.    She failed to record the interview she conducted for approximately thirty (30) minutes with C.E.K. (Ex. A, p. 145, lines 2-22).

19.    She also failed to record the interview with plaintiff Danielle Kull, his mother, for approximately an hour on December 7, 2024 at the Cincinnati Public Library (Ex. A, p. 145, lines 2-22).

20.    She simply failed to record the interview even though the recording of client interviews in litigation had seen part of her forensics psychiatry training. (Ex. A, p. 148, line 20 – p. 149, line 18).

21.    Dr. Copley's opinion in this case is presented in her expert report:

**I.    Charles is having mental health symptoms from the prolonged recovery of his arm injury and meets criteria for Adjustment Disorder.**

The criteria for Adjustment Disorder are:

1.  The development of emotional or behavioral symptoms in response to an identifiable stressor(s) occurring within 3 months of the onset of the stressor(s).

    In Charles Kull's case, the injury to his arm is only the first part of the stressor. The need for multiple surgical interventions followed by prolonged periods of not being able to engage in his typical physical activities has resulted in concerning changes to Charles's

5

behaviors, social development and demeanor. His parents described Charles having difficulties with managing his emotions and frustration resulting in him making comments that he wished he lost his arm completely, and thoughts of not wanting to live. They also endorsed concerns that Charles is unhappy and not able to fully be social with his peers or discharge his love of competing through sports. Concerningly, Charles spends the majority of time at home playing video games to the extent that he does not eat dinner with the family and does not stop for bathroom breaks resulting in accidents of bowel and bladder. This gaming is a social outlet on some level, but I am concerned that this is the maladaptive way that Charles satisfies his desire to compete and discharges emotions and stress since sports are not available to him currently.

2. These symptoms or behaviors are clinically significant, as evidenced by one or both of the following:

      a. Marked distress that is out of proportion to the severity or intensity of the stressor, taking into account the external context and the cultural factors that might influence symptom severity and presentation.

      b. Significant impairment in social, occupational, or other important areas of functioning.

(Ex. D, p. 13)

22. Plaintiffs' expert's factual support is denied by C.E.K. himself in his sworn testimony:

[By Mr. Niceswanger] Q: Okay. We've talked a lot about kind of your school and stuff. I want to just ask, what do you and your family do together?

[By. C.E.K.] A: Sometimes we play board games together.

Q: Okay which games do you like?

A: Cranium.

Q: Are you good at it?

The Reporter: Repeat that.

The Deponent: Cranium.

[By Mr. Niceswanger] Q: And what's Cranium?

A: It's a trivia thing – a trivia game.

6

Q: My sense from your school records, and just talking with you a couple of times we've had a chance to visit, is you're a pretty smart dude.

A: Yeah.

Q: Is that fair?

A: Yeah.

Q: And you like trivia, but trivia's based a lot on your knowledge of the world. Fair?

A: Yeah.

Q: What other did – what else do you do with your family? I know you got a pool, young hang out there probably with your family?

A: Yeah.

Q: Shove your brothers in the pool?

A: Yeah.

(C.E.K. Depo, Ex. B, p. 79, line 21- p. 80, lines 1-24).

.    .    .

Q: Some families will, you know, go to the zoo once a summer, or do this or that. Do you have like regular activities that you guys do on either a weekly, monthly, yearly basis, things like that, or kind of traditions?

A: Usually, every year, we fly down to my grandparents in – in Florida, and stay there for like a week.

Q: You like that?

A: Yeah.

(Ex. B, p. 81, lines 15-24)

.    .    .

Q: Sitting here today, you seem like you've got a pretty positive attitude about what your future holds in store. Is that fair?

A: Yeah.

(Ex. B, p. 82, lines 14-17)

. . .

Q; The same lady that wrote the report said you don't eat dinner with your family. Is that true?

A: I eat with them most days.

Q: That's – okay. That was the impression I got. I mean, you seem like you're pretty outgoing. Is that fair?

A: Yeah.

Q: Okay. So I realize everybody probably misses meals with their family once in a while, but it sounds like you guys eat together most of the time. Is that true?

A: Yeah.

(Ex. B, p. 86, lines 6-18)

. . .

Q: In terms of your friends here, was it tough kind of making friends when you got transferred back here?

A: Yeah, a bit.

Q; Okay. And do you go visit guys at their house or they come to your house? Do you go do things together?

A: Yeah.

(Ex. B, p. 88, lines 1-10)

. . .

Q: And while you're playing the video games, do you have the speaker or headphones with the speaker where you're talking with them too?

A: Yeah.

Q: So when I was a kid, we used to get together and play pool or ping pong in kids' basements. My impression now is that – that all the kids get online, and play games, and talk to each other that way. Is that kind of the – the way it works?

A: Yeah.

Q: So you may not be physically present with your pals like you might have been 20 or 30 years ago, but in today's world, the socialization is playing the video games and talking with your buddies while you're playing the game?

A: Yeah.

(Ex. B, p. 105, line 1 – p. 106, line 4)

. . .

Q: All right, I've got to grab something I've got down here, and I think I'm about done. Are you okay to keep going? I don't want you falling asleep on me here. Tell me about meeting with his lady, Ms. Cole. Do you remember who she is?

A: Yeah.

Q: Tell me what – everything you remember about what went on with her.

A: We met in a library in Cincinnati. She like asked me – she talked to me about what had happened to my arm and stuff. She just asked me tons of questions.

Q: How long do you think you talked to her?

A; Like an hour and a half.

Q: Okay. And did she tell you why she was talking to you?

A: I don't think so.

Q: Did she talk to you at all about what it was like getting moved around as being part of an army family?

A: Yeah.

Q: And what'd you tell her?

A: That it was nice meeting people, but it was not nice leaving my friends.

Q: Did she ask anything more about what was the good and the bad?

A: I don't think so.

Q: And she said in – in her report and in her testimony, she was talking about – she said she asked you about drugs, or alcohol, or anything like that. You don't do any of that, do you?

A: (Nods head.)

9

Q: Okay.

The Reporter: C-, can you say that verbally, please?

The Deponent: No.

The Reporter: Thank you.

(Ex. B, p. 103, line 16 – p.104, lines 25)

.    .    .

Q: Did she ask you about these previous arm injuries that you had?

A: I think so.

Q: Did you tell her the same things you told us?

A: Yeah.

Q: Did she have you do any tests or anything, or she just talked to you?

A: She just talked to me.

Q: What'd you think of that experience?

A: It wasn't very fun. We just talked for like an hour straight.

Q: One of the things she talked to you about in her report, you know, I'll tell you I want to be sensitive about this because I'm not here to try to embarrass you or anything else. She talked about sometimes when you're playing video games, you don't get up to go to the bathroom. Is that true? And she said that's been going on before the trampoline incident. Is that fair?

A: (Nods head.)

Q: You have to say yes for the reporter.

A: Yes.

Q: Is – is that anything that has anything to do with your elbow?

A: No.

Q: Okay. I get it. Sometimes you get so engrossed in the games you don't want to leave.

A: Yeah.

(Ex. B, p. 105, line 1 – p. 106, line 4)

.    .    .

23.    The mental health expert has not communicated with any other mental health professional about her evaluation of CEK and her report in this case.  (Ex. A, p. 54, line 16 – p. 55, line 2).

24.    Plaintiffs' expert has done no research on the topic of orthopedic trauma and mental health harm in children (Ex. A, p. 54, lines 7-15).

### B.  Legal Standard

As a preliminary matter, the proponent of the expert testimony must prove its admissibility by a preponderance of the evidence. *Bourjaily v. United States,* 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987); *see Daubed,* 509 U.S. at 592 n. 10, 113 S.Ct. 2786. Determining whether or not to permit an expert to provide opinion testimony is controlled by Fed. R. Evid. 702, *Daubed v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), *Kumho Tire Co., Ltd.* v. *Carmichael,* 527 U.S. 137 (1999) and their progeny. Rule 702 requires that a witness be qualified by knowledge, skill, experience, training or education. Rule 702 states that an expert may testify if so qualified and if:

(a)    The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b)    The testimony is based on sufficient facts or data;
(c)    The testimony is the product of reliable principles and methods; and
(d)    The expert has reliably applied the principles and methods to the fact of the case.

It is well established that Rule 702 imposes a gatekeeper obligation on the District Court to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Dodge v. Cotter Corp.,* 328 F.3d 1212, 1221 (10th Cir. 2003) (citing *Daubert,* 509 U.S. at 589). The gatekeeper function requires the judge to assess the reasoning and methodology underlying the expert's opinion and determine whether it is both scientifically valid

and applicable to a particular set of facts. *Id.* The Court is also to determine that the testimony has "a reliable basis in the knowledge and experience of [the relevant] discipline." *Id.* at 1222 (citing *Kumho Tire,* 527 U.S. at 149 (quoting *Daubert* 509 U.S. at 592)).[2]

The plaintiffs must show that the basis for the expert's opinions, and the method employed by Dr. Day in reaching his opinions, is scientifically sound and that the opinions offered are based on facts and qualifications which satisfy Rule 702's reliability requirement. *Dodge,* 328 F.3d at 1222, (citing *Mitchell v. Gencorp, Inc.,* 165 F.3d 778, 781 (10th Cir. 1999)). To assist in determining the reliability requirements, the Supreme Court in *Daubert* listed four non-exclusive factors that a trial court may consider:

(1) Whether the opinion at issue is susceptible to testing and has been subjected to such testing;

(2) Whether the opinion has been subjected to peer review;

(3) Whether there is a known or potential rate of error associated with the methodology used and whether there are standards controlling the technique's operation; and

(4) Whether the theory has been accepted in the scientific community.[3]

If the court determines the witness is qualified, the proffered expert testimony is admissible only if: "(1) The testimony is based on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has reliably applied the

---

[2] In *Kuhmo Tire,* the Supreme Court held that the gatekeeping obligation under *Daubert,* which requires inquiry into the relevance and reliability of expert testimony, applies not only to "scientific" testimony, but to all expert testimony. *Kuhmo,* 526 U.S. at 137. The objective of such a requirement is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

[3] Under *Daubert,* any step that renders the analysis unreliable renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology. *Dodge,* 328 F.3d at 1222 (citing *Mitchell,* 165 F.3d at 778, 782 (1999) (quoting *In Re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717, 745 (3rd Cir. 1994)). It is critical that the district court determine whether the evidence is genuinely scientific as distinct from being unscientific speculation offered by a genuine scientist. *Id.* (citing *Mitchell,* 165 F.3d at 783 (quoting *Rosen v. Ciba-Geigy Corp-,* 78 F.3d 316, 318 (7th Cir. 1996))).

principles and methods to the facts of the case." *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 590-93 (1993). To satisfy the reliability requirement, the party offering the expert testimony "must show by a preponderance of the evidence both that the expert is qualified to render the opinion and that the methodology underlying his conclusions is scientifically valid." *Barrett v. Rhodia, Inc.,* 606 F.3d 975, 980 (8th Cir. 2010).

### C. Limitations of Mental Health Testimony

It has been suggested that much (and perhaps most) mental health expert testimony should not survive scrutiny under the existing framework for the admission of expert testimony.[4] A witness may be qualified as an expert by virtue of her "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. However, "[e]xpertise in one field does not qualify a witness to testify about others." *Lebron v. Secretary of Florida Dept. of Children and Families,* 772 F.3d 1352, 1368 (11th Cir. 2014) (holding that a psychiatrist was properly prevented from opining on rates of drug use because he had never conducted research on the subject, and instead relied on studies to form his opinion); *Moore v. Intuitive Surgical, Inc.,* 995 F.3d 839, 854 (11th Cir. 2021). An expert, however well credentialed, cannot be "the mouthpiece of a scientist in a different specialty." *Id.* at 1369 (quoting *Dura Automotive Systems of Indiana, Inc. v. CTS Corp.,* 285 F.3d 609, 614 (7th Cir. 2002)); *In Re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation,* 638 F.Supp.3d 227 (E.D. NY 2022); *Hart v. BHH, LLC,* No. 15-CV-4804, 2018 WL 3471813, at *8 (S.D.N.Y. July 19, 2018); *TB Food USA, LLC v. American Mariculture, Inc.,* 2021 WL 4962969, at *4 (M.D. Fla. October 26, 2021) ("[A]n expert must have at least some minimum training, education, experience, knowledge, or skill pertaining to the particular subject matter of [her] proposed testimony.").

---

[4] Grove, W.M. and Barden, R.C. (2000) Protecting the Integrity of the Legal System: The Admissibility of Testimony from Mental Health Experts Under Daubert/Kumho Analyses, Psychology, Public Policy and Law, Vol. 5, No. 1, 234-242.

Merely reading literature in a scientific field does not qualify a witness—even an educated witness—as an expert. *Kadel v. Folwell*, 2022 WL 3226731, at *9, 13 (M.D.N.C. August 10, 2022) (excluding expert opinion about puberty delaying medication because he is a surgeon, not an endocrinologist, and he never treated a patient with hormone therapies). If an expert witness does not intend to testify about matters growing directly out of "research [s]he had conducted independent of the litigation," the expert should be disqualified. *Lebron*, 772 F.3d at 1369 (quoting Fed. R. Evid. 702); *United Phosphorus, Ltd. v. Midland Fumigant, Inc.,* 173 F.R.D. 675 (D. Kan. 1997).

### D. Dr. Copley should be Excluded Because She is Does Not Meet the Criteria for Providing Expert Testimony in this Case

#### 1. Plaintiffs' Expert is Not Qualified to Testify About the Impact of Orthopedic Trauma on Children

When  determining the reliability of a proffered medical expert's opinion, courts have discounted the reliability of experts who formed their opinions only within the context of litigation. *Nelson,* 92 F. Supp. 2d at 967; *Daubert* at 1317 (9th Cir.1995) *(Daubert II)* (If an expert testifies based on research he has conducted independent of the litigation this provides important, objective proof that the research comports with the dictates of good science") 43 F.3d at 1317. A scientific expert's "normal workplace is the lab or the field, not the courtroom or the lawyer's office." *Nelson,* 92 F. Supp. at 968. Expert testimony must be based directly on legitimate, preexisting research unrelated to the litigation to support the opinions are "derived by the scientific method." *Daubert II,* 43 F.3d at 1317. If the proffered expert testimony is not based on education, experience or independent research, a party must come forward with *objective, verifiable evidence that the testimony is based on "scientifically valid principles." Id.* at 1318 (emphasis added).

14

Two primary methods for demonstrating that expert scientific testimony is reliable are to show: (1) the expert's testimony grows out of pre-litigation experience and/or research; or (2) that the expert's research has been subjected to peer review. 173 F.R.D. at 682. The law is clear that "merely possessing a medical degree is not sufficient to permit a physician to testify concerning any medical-related issue." *Miller v. Pfizer, Inc., 196 F.Supp.2d 1062, 1087 (2002) (citing Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965, 970 (10th Cir.2001) (orthopedic surgeon and oncologist not qualified to testify regarding warnings on intramedullary nailing device)). Plaintiffs thus have the burden of establishing the admissibility of Dr. Day's opinions based on something more than just being a medical doctor. Miller v. Pfizer, Inc., 196 F.Supp.2d 1062, 1087 (2002).*

Before assessing the reliability of an expert's testimony, a district court must "determine if the expert's proffered testimony ... has 'a reliable basis in the knowledge and experience of his [or her] discipline.' " *Bitler v. A.O. Smith Corp.,* 400 F.3d 1227, 1232-33 (10th Cir. 2004) (quoting Daubert, 509 U.S. at 592). This requires an inquiry into the expert's qualifications and the admissibility of the proffered evidence. *Id.* at 1120. Various district court cases in the Tenth Circuit illustrate that an expert physician's testimony should be strictly scrutinized where that expert comments on how another physician performed his or her job, especially when the expert is qualified in a different discipline. *See, e.g., Wright v. Liberty Mut. Fire. Ins. Co.,* 2009 U.S. Dist. LEXIS 93964 (D. Colo. 2009); *Latshaw v. Mt. Carmel Hosp.,* 53 F. Supp. 2d 1133 (D. Kan. 1999).

In *First Savings Bank, F.S.B. v. U.S. Bancorp,* 117 F. Supp. 2d 1078, 1083 (D. Kan. 2000), the court noted that it must determine the competency of an expert witness. The court explained, in making this determination, two general conditions must be met. "[F]irst, the subject matter must be closely related to a particular profession, business or science and not

within the common knowledge of the average layman; second, the witness must have such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth." [Quoting *Kloepfer v. Honda Motor Co.,* 898 F.2d 1452, 1458 (10th Cir. 1990).] 117 F. Supp. 2d at 1083. The Court concluded that the expert's lack of qualifications were "far beyond mere lack of specialization." 117 F. Supp. 2d at 1084, and found the expert witness was not qualified to testify on several grounds. The Court focused its decision on the fact that the expert "based his opinion on an assumption of the very fact that his report [was] intended to prove" and the witness ignored significant factors when formulating his opinion. 117 F. Supp. 2d at 1084.

First, the Court must examine the qualifications of Dr. Copley to render expert opinions related to the evaluation and diagnosis of a pediatric patient in the setting presented in this case. While Dr. Copley is a psychiatrist, that fact does not mean that she is competent to provide expert testimony in a case with a child patient with an orthopedic trauma. Her report, CV, and testimony disclose that she has been a psychiatrist since 2006, but has been doing general practice. Her child psychiatry practice has been limited between 2010-2011 and appears to have involved child abuse. She is a board-certified child abuse pediatrician and is Oklahoma's Chief Child Abuse Examiner, seeing one thousand (1,000) children a year who have possibly been the victim of child abuse. Dr. Copley has only testified in three (3) cases and has never been recognized as an expert or being allowed to testify about the effect of an orthopedic injury on a child. Dr. Copley is not qualified to testify in this case.

Dr. Copley is a psychiatrist with the vast majority of her clinical experience coming from treating college students (2011-2022). While she has some pediatric experience, it is in the area of sexual abuse, not in the area of the impact of an traumatic orthopedic injury to a child. She is proffered as an expert based on her training and experience, and her reading and

assessment of "the relevant literature, and the potential effects of orthopedic trauma," however, she has no experience with the provision of care to patients like C.E.K. She has never published any papers or studies on the impact of traumatic arm injuries or any other physical injury in children, nor has she published any reviews of such patient care in her entire career. District courts in the Tenth Circuit illustrate that an expert physician's testimony should be strictly scrutinized when the expert is qualified in a different discipline. *See, e.g., Wright v. Liberty Mut. Fire. Ins. Co.,* 2009 U.S. Dist. LEXIS 93964 (D. Colo. 2009); *Latshaw v. Mt. Carmel Hosp.,* 53 F. Supp. 2d 1133 (D. Kan. 1999).

Before assessing the reliability of an expert's testimony, a district court must "determine if the expert's proffered testimony ... has 'a reliable basis in the knowledge and experience of his [or her] discipline.' " *Bitler v. A.O. Smith Corp.,* 400 F.3d 1227, 1232-33 (10th Cir. 2004) (quoting *Daubert,* 509 U.S. at 592). Without *any* qualifications, training or experience specifically related to children like C.E.K. with traumatic injuries, Dr. Copley is not qualified to give an expert opinion on the subject. *See Kadel,* 2022 WL 3226731, at *13.[5] Nor is she qualified to opine on studies related to arm injuries to children or its impact on the patient. *See Dura Automotive,* 285 F.3d at 614 ("[A] scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty.").

Dr. Copley's opinions and so-called review of literature did not "grow[] naturally and directly out of research [s]he had conducted independent of the litigation." *Lebron,* 772 F.3d at

---

[5] *See also, e.g., Fernandez v United States,* 2020 WL 3105925, at *5 (N.D. Fla. June 4, 2020) (excluding an expert because the Plaintiff offered "no information indicating that he has any experience or specialized knowledge regarding medicine generally or any of the branches of medical science which might be relevant to causation"); *Doctors Licensure Group, Inc. v. Continental Casualty Company,* 2011 WL 13182969, at *4 (N.D. Fla. September 26, 2011) (excluding a proffered expert on accounting because he was "not an accountant" and had "virtually no experience in accounting"); *Webb v. Carnival Corporation,* 321 F.R.D. 420, 429 (S.D. Fla. 2017) ("Because Mr. Jaques has no experience in toxicology, responsible alcohol vending policies, nor medicine, and has never served onboard the California Dream, he is unqualified to opine on the Decedent's level of intoxication[.]").

1369 (cleaned up); *see also* Fed. R. Evid. 702, Advisory Comm. Notes (2000 Amendments). Here, Dr. Copley reviewed three articles (Ex. E, F, and G, Copley Depo Ex. 9, 10, and 11), which she does <u>not</u> consider authoritative and she developed her opinions in connection with the litigation. She seeks to present opinions here when all she did was look at medical treatment records with no specific psychiatric evaluations, did some reading into three (3) random articles, and interviewed C.E.K. for thirty (30) minutes and the mother for ninety (90) minutes on December 7, 2024, along with a couple of follow-up phone calls. (Ex. D, p. 1).

2. <u>Dr. Copley's Testimony is Not Based on Sufficient Facts or Evidence</u>

Dr. Copley's testimony presents that there is a lack of literature and studies pertinent to the effects of an elbow injury to a child (Ex. A, p. 27, line 11 – p. 28, line 8). The situation is made worse because of the continued uncertainty of how C.E.K. will end up following treatment. Without any evidence (and with no experience or training in the subject), plaintiffs' expert can only guess on the present, and the future, need and effects of the traumatic orthopedic injury and treatments. Guessing is not permitted under Rule 702. *McDowell*, 392 F.3d at 1301 (noting that while an expert may "draw conclusions from existing data," drawing "conclusions where there was no existing data" amounted to a "mere guess" that "fails the tests for expert opinion"); *Magical Farms, Inc. v. Land O'Lakes, Inc.*, 2007 WL 4727225, at *2 (N.D. Ohio March 8, 2007) ("Dr. Ames' report is replete with statements like, 'suggest the possibility,' 'may have,' and 'I would be concerned,' all of which fail to rise to the level of a reasonable degree of certainty required by courts."). To substantiate her untrained guesswork, Dr. Copley briefly discusses just three (3) articles she feels are related to this case. (Ex. D, p. 15, FN 4 and 5, p. 16, FN 6). None of the articles is authoritative according to the plaintiffs' expert, or relate to and elbow injury.

Simply put, Dr. Copley's opinions stems solely from her own limited experience and lack of knowledge. Not only does she not cite, let alone discuss, relevant, authoritative, literature in this area, but throughout her testimony, she repeatedly just recites unsupported facts in support of her position.[6] Her opinions are completely unreliable and ignore the facts in this case and leave the jury to guess and speculate. In other words, her opinion ignores the entirety of the facts and uncertainty of current treatments, none of which shows any significant effects on C.E.K. on account of the alleged misdiagnosis in September 2021. *See* Corrected Edmiston Rebuttal Report, ¶¶ 26, 29-30. In sum, Dr. Copley's overall discussion about this case how C.E.K. has responded and what will need in the future is completely unreliable and should be excluded *in toto*.

### 3. Dr. Copley's Opinions Lack Reliability Because They Are Not Based on Any Methodology.

The testimony that defendant asks the Court to strike is, without question, expert testimony and subject to Rule 702, and existing precedent. As part of the pretrial evaluation, the trial court must determine whether the expert opinion is based on facts that enable the expert to express a reasonably accurate conclusion as opposed to conjecture or speculation. *See In re Cessna 208 Series Aircraft Products Liability Litigation,* 2009 WL 3190458 (citing *Mitchell v. Gencorp, Inc.,* 165 F.3d 778, 780 (10th Cir. 1999)).

Next, we must examine the issue of the issue of reliability of Dr. Copley's testimony. Dr. Copley's Report does not provide any methodology for her "opinion" about C.E.K.'s diagnosis. At her deposition, she testified that she employed no methodology. (Ex. A., p. 142, line 24 – p. 143, line 10). The reason for this is simple: Dr. Copley does not know what the effects of an

---

[6] For example, Copley reports that C.E.K. does not eat with his family and instead, sits in his room in isolation, playing video games and urinating and defecating on himself (Ex.1, p. 111, line 11 – p. 112, line 2). C.E.K. robustly disputes this fact claimed by Dr. Copley. (Ex. B, p. 105, line 13 – p. 106, line 1).

arm injury, and she does not know what the ultimate outcome is for C.E.K. in this case and simply speculates herself, and accordingly, all her opinions are hypothetical, speculative and unmoored from facts or medical/psychiatric data.

An expert's reliability, concerns whether the reasoning or methodology underlying the testimony is scientifically valid, and whether that reasoning or methodology properly can be applied to the facts in issue are a matter for the Court. *Kilpatrick*, 613 F.3d at 1335. When evaluating whether an expert's methodology is reliable, the Court considers, among other things:

> (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community.

*Frazier*, 387 F.3d at 1262; *Kumha Tire Co., Ltd. v. Carmichael,* 526 U.S. 137 (S. Ct. 1999); Mitchell v. Gencorp, Inc., 165 F.3d 778, 781 (10th Cir. 1999). *Hollander v. Sandoz Pharmaceuticals Corp.,* 289 F.3d 1193 (10th Cir. 2002) (citing *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996) ([T]he courtroom is not the place for scientific guesswork, even of the inspired sort.")).The court must undertake an independent analysis of each step in the logic leading to the expert's conclusions, and if any step in the logic is deemed unreliable, the expert's entire opinion must be excluded. *Hendrix v Evenflo Co., Inc.*, 255 F.R.D. 568, 578 (N.D. Fla. 2009) (citing *McClain v. Metabolife Int'l., Inc.*, 401 F.3d 1233, 1245 (11th Cir. 2005)). Likewise, if the expert's opinions are vague or based on "leaps of faith unsupported by good science," then those opinions should be excluded as well. *Id*. at 579; *McDowell v. Brown*, 392 F.3d 1283, 1299, 1301 (11th Cir. 2004) (characterizing the experts' opinions as "too vague" and "more of a guess than a scientific theory.").

a.    Dr. Copley's Opinions are Vague and Imprecise.

Opinions like Copley's are too vague and imprecise to be sufficiently reliable. Dr. Copley

cannot identify when, or under what circumstances, the adjustment disorder arose, she merely

says that on December 7, 2024 when she met C.E.K., he had this diagnosis. She cannot say

when the adjustment disorder started – and claims she was not provided, or did not consider

information about significant life events for C.E.K. which could well have caused any disorder

he may experience.[7] Where she draws the line is completely unknown, making her opinion

vague and imprecise. *See Ward v Carnival Corporation*, 2018 WL 11383459, at *6 (S.D. Fla.

July 31, 2018) (excluding expert testimony because it was "unclear precisely what [the expert]

was claiming.").

Dr. Copley is not certain whether all children with elbow injuries result in an adjustment

disorder. Her opinion is also not based on research related to childhood traumatic orthopedic

injuries. She also omits all literature on the impact of being a military child in the medical

context and particularly the mental health context about treatment of disorders occurring over

several years of children bouncing from place to place. These cavernous omissions render

her opinion about decision-making in this context both imprecise and misleading, she attempts

to mislead the Court and jury by leaving out the proper context, and implying to the Court and

jury that C.E.K.'s alleged "adjustment disorder" resulted from the September 2021 trampoline

incident and medical care.

b.  Dr. Copley's Opinions are Not Generally Accepted

General acceptance in the relevant scientific community is an important element to the

reliability inquiry. See *Kumha Tire Co., Ltd. v. Carmichael,* 526 U.S. 137 (S. Ct. 1999); *Allison*

---

[7] C.E.K.'s memory of the interview differs from Dr. Copley's, and he testified that she did inquire about his
previous injury. (Ex. B, p. 105, line 1 – p. 106, line 4).

*v. McGahn Medical*, 184 F.3d 1300, 1313 (11th Cir. 1999). Not only is widespread acceptance an important factor in assessing the reliability of an expert's opinions, but the fact that a known theory "has been able to attract only minimal support within the community may properly be viewed with skepticism." *Daubert*, 509 U.S. at 594. Here, Dr. Copley's opinions about the impact of an elbow injury is far outside the mainstream of medical and psychiatric opinion. In fact, her views do not appear to be supported by any specific authority in the field of psychiatry. Dr. Copley's opinions about C.E.K. "adjustment disorder" are not generally accepted by the psychiatric community her testimony is unreliable. *Allison*, 184 F.3d at 1319.

### 4. Dr. Copley's Opinions Will Not Assist the Trier of Fact

We next turn to whether Dr. Copley's testimony will assist the trier of fact in this case? Expert testimony is helpful to the trier of fact if it explains subjects that are beyond the understanding of the average lay person. *Frazier*, 387 F.3d at 1262. The testimony must offer more than what lawyers can argue in closing arguments. *Id*. Expert testimony is not helpful if it fails to "fit" with the facts of the case. *See Sawyer v. Southwest Airlines, Co.,* 243 F.Supp.2d 1257 (D. Kan. 2003); *McDowell*, 392 F.3d at 1299. This happens when a large analytical leap must be made between the facts and the opinion. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (offering animal studies showing one type of cancer in mice to establish causation of another type of cancer in humans is considered "too great an analytical gap").

Dr. Copley's expert testimony will not assist the trier of fact for several reasons. First, her opinion about C.E.K. having an "adjustment disorder" does not fit the facts of the case. She references C.E.K.'s preoccupation with video games, but the reality is that all C.E.K.'s behavior is generally seen in the child psychology. Accordingly, her opinion whether C.E.K.'s behavior is normal or abnormal, is irrelevant to the facts of the case. *See Kadel*, 2022 WL 3226731, at *14 (excluding expert opinion on informed consent in the context of gender

dysphoria because the patient's father gave consent).

Next, how children respond to an elbow injury, or any traumatic orthopedic injury, is well within the understanding of the average lay person, and it is certainly something counsel can argue in closing. Since there already exists a lay understanding of childhood behavior, there is no call for expert testing. It is well-established that untestable "common sense" does not satisfy Rule 702's requirements. *See Fedor v. Freightliner, Inc.*, 193 F.Supp.2d 820, 832 (E.D. Pa. 2002) ("Generalized common sense does not rise to the level of expert opinion solely because it is offered by someone with an academic pedigree.").

Third, her opinion about the effects of having multiple surgeries for a child is also within the understanding of the average person. The Court does not need an expert to explain the things we do not know. These can easily be explained by the parents, or in closing argument. *See Frazier*, 387 F.3d at 1262 ("Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments.").

5. Dr. Copley's Opinions are Speculative and Unduly Prejudicial.

Last, we need to recognize that Dr. Copley's testimony is speculative and unduly prejudicial. Such comments by Dr. Prassmore (i.e. that this case was one of the two worst cases that she has seen, that the victim would have been crying and the beating would have been loud) should be excluded as it was not based on her observations of the evidence in the case. Without any testing and based only on factually inaccurate information in her report, Copley conjures up a diagnosis of "adjustment disorder." Dr. Copley takes the quantum leap which is equally unreliable because the steps in her "analysis" are disconnected.

There are several problems with this "opinion." First, her conclusion about C.E.K. having an adjustment disorder is not arrived at by any research, methodology, and based on

23

facts, at best, is a guess, just like her speculation about what C.E.K.'s medical outcome will be. She cannot say with any certainty (or authority) the facts that support her diagnosis. To the extent Dr. Copley attempts to identify facts - she is disputed by C.E.K. himself and medical records. The same is true for her ultimate opinion that C.E.K. has an adjustment disorder. She does not cite a single study that supports this opinion. *McDowell*, 392 F.3d at 1301 (drawing "conclusions where there was no existing data" amounted to a "mere guess" that "fails the tests for expert opinion").

There is a disconnect between the two steps in her analysis. Dr. Copley never explains how the smattering of unsupported facts "fit" into the diagnosis and more.  In other words, she never explains how her conclusion about an adjustment disorder is supported and, more importantly, she draws no causal relationship to the alleged September 2021 elbow injury at issue. There is thus a large "analytical gap" in her methodology that renders her ultimate opinions unreliable. *See Joiner*, 522 U.S. at 146.

For her opinions to be reliable, Dr. Copley must have "knowledge," which requires "more than subjective belief or unsupported assumptions." *Daubert*, 509 U.S. at 590. Dr. Copley does not have the requisite knowledge for her opinion. To assume that her opinions are correct (despite a lack of evidence and experience) would be to rely on her *ipse dixit* based on conjecture to judge the reliability of her conclusion. *See Bowers v Norfolk Southern Corp.*, 537 F.Supp.2d 1343, 1355 (M.D. Ga. 2007) (" The Court cannot rely on [the expert's] *ipse dixit* to judge the reliability of his conclusion[.]"); *General Elec. Co. v. Joiner,* 522 U.S. 136 (S. Ct. 1997).

## CONCLUSION

Dr. Copley is not a qualified expert on the subject of the psychiatric impact of an elbow injury in a pediatric patient with a currently unknown outcome. Her opinions and testimony are

neither relevant nor reliable under Federal Rule of Evidence 702 and the standards set forth in *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993), and its progeny. Her opinions and testimony are likewise inadmissible because any probative value they may have (and they have none) is substantially outweighed by the danger of unfair prejudice, confusion of the issues, waste of time, undue delay, and needless presentation of cumulative evidence. *See* Fed. R. Evid. 403.

Dr. Copley's report and opinions are nothing more than a recitation of what she has had told by the plaintiffs and their minor son, and her resulting miraculous diagnosis. Her facts are not supported by the evidence. She does not say anything about the methodologies behind her work (because she had none), provide any authoritative peer reviewed, support, or address how or whether research is applicable to the context this case. In fact, she disclaims them away after identifying them, saying the literature she reviewed are not authoritative. Without any qualifications or training in the area of childhood response to an elbow injury, her use of these articles to support her opinions is completely unreliable and the type of hypothetical guesswork prohibited by Rule 702. *Lebron*, 772 F.3d at 1368 (Expertise in one field does not qualify a witness to testify about other things.). The fact that a witness has general experience in a field does not necessarily qualify the witness as an expert. *See LifeWise Master Funding v. Telebank,* 374 F.3d 917, 928 (10th Cir.2004) (affirming exclusion of witness who was not qualified as an expert); *TK–7 Corp. v. Estate of Barbouti,* 993 F.2d 722, 728 (10th Cir.1993) (same); *Broadcort Capital Corp. v. Summa Med. Corp.,* 972 F.2d 1183, 1195 (10th Cir.1992) (holding that witness with some general experience and education in the field lacked sufficient qualifications to qualify as expert in the area).

Most disturbingly, however, and demonstrative of her extremely lack of methodology, is the fact that she does not discuss anything about the original injuries C.E.K. sustained to

his right forearm back in 2018. This lad, in two separate incidents only weeks apart in 2018, experienced a fractured radius and ulna. Both of these independent events resulted in fractures to both bones in his right forearm and the bones were allowed to heal out of alignment. She does not include how these prior injuries factor into her diagnosis. Further she disregards which she was aware of literature that suggests that young children of military personnel experience mental health issues. Indeed, she simply presents a sanitized opinion disregarding all of the other traumatic events in C.E.K .'s life which may have impact on his mental health.  Plaintiffs' expert does not refer to these other facts, but rather supports her opinion by simply ignoring them. Can Dr. Copley opine of the effects of an elbow injury, without including the comprehensive background and context for C.E.K.? The answer is she cannot.

**WHEREFORE**, Defendant respectfully prays that the Court enter an order excluding Dr. Copley's report, expert opinions and testimony in their entirety,  or to the extent the Court deems proper and for such further relief as the Court deems fair and reasonable under the circumstances.

Respectfully submitted,

**EVANS & DIXON, L.L.C.**

Brian J. Niceswanger          KS #12531
Stephanie A. Preut          KS #24971
82 Corporate Woods, Suite 900
10851 Mastin Boulevard
Overland Park, KS 66210
(T) 913.701.6810
(F) 913. 341.2293
KCCivilLit@evans-dixon.com
**ATTORNEYS FOR DEFENDANT**
**VALOR NETWORK, INC.**

## CERTIFICATE OF SERVICE

On this 18th day of July, 2025, the undersigned hereby certifies that a copy of the above and foregoing was sent via the electronic filing system:

Barry A. Clark, #13083
CLARK & PLATT, CHTD.
417 Poyntz Avenue
Manhattan, KS  66502
barry@clarkplatt.com

and

Craig J. Altenhofen, #11436
Steven L. Hornbaker, #08062
ALTENHOFEN LAW OFFICE,
CHARTERED
117-A W. 8th St.
Junction City, KS  66441
caltenhofen@altenhofenlaw.com
steve@altenhofenlaw.com
**ATTORNEYS FOR PLAINTIFFS**

Brian L. Burge, #21531
Kaitlin M. Marsh-Blake, #26462
SANDERS, WARREN & RUSSELL, LLP
11225 College Blvd., Suite 450
Overland Park, KS  66210
b.burge@swrllp.com
k.marsh-blake@swrllp.com
**ATTORNEYS FOR DEFENDANT
SCOTT HABAKUS, D.O.**

ATTORNEY FOR DEFENDANT